NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1889-20

EUGENE BERTA,

      Appellant,

v.

NEW JERSEY STATE
PAROLE BOARD,

      Respondent.

_____

APPROVED FOR PUBLICATION

August 2, 2022

APPELLATE DIVISION

Argued June 2, 2022 – Decided August 2, 2022

Before Judges Hoffman, Geiger, and Susswein.

On appeal from the New Jersey State Parole Board.

Kevin S. Finckenauer, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Kevin S. Finckenauer, of counsel and on the briefs).

Susanne Davies, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Acting Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Suzanne Davies, on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

State prison inmate Eugene Berta appeals the January 27, 2021 final decision of the New Jersey State Parole Board denying parole and imposing a seventy-two-month future eligibility term (FET). Berta, who was seventy-one years old when the final agency decision before us was rendered, is serving a life term for the murder of his girlfriend. The crime was committed during the summer of 1983. He was tried, convicted, and sentenced in 1984, and completed the court-imposed thirty-year period of parole ineligibility in September 2014. Berta's initial application for parole was denied in 2015 and the Board imposed a 120-month FET. He once again became eligible for parole in March 2020.

The Board's decision to deny parole a second time relies principally on three supposedly negative circumstances: (1) Berta was "committed to incarceration for multiple offenses"; (2) he has a "serious" and "persistent" history of institutional disciplinary infractions; and (3) his continued denial of guilt constitutes "insufficient problem resolution." After carefully reviewing the record in light of the governing legal principles, we reverse and remand for the Parole Board to reconsider its decision. If the Parole Board on remand determines that Berta should not be released, it must thoroughly explain the reasons for overcoming the presumption of parole and for imposing an FET beyond the twenty-seven-month presumptive FET.

2

We conclude that the Board improperly relied on the first purportedly negative circumstance. Berta's jury trial convictions for murder and possession of a firearm for an unlawful purpose were merged at the sentencing hearing and thus he was not committed to state prison based on multiple offenses. As to Berta's record of institutional infractions, we believe the Board was unreasonable in characterizing Berta's infraction history as persistent given that he has been infraction-free for nearly twenty years. Even affording due deference to the Board's expertise, we do not believe Berta's overall infraction history can reasonably be interpreted to suggest a likelihood of reoffending.

As to Berta's denial of guilt, the Board has yet to satisfactorily explain why that circumstance, viewed in context with his overall rehabilitative efforts, establishes by a preponderance of the evidence that he is substantially likely to re-offend. While Berta's ongoing refusal to accept responsibility for the murder he committed is a relevant circumstance, we hold that admitting guilt is not a categorical prerequisite to parole. Accordingly, the Board shoulders the burden to explain why Berta's refusal to acknowledge his guilt foreshadows that he will commit a future crime. It is not enough for the Board to state a conclusion. Rather, the Board must explain how it reached its conclusion that Berta is substantially likely to reoffend. This explanation is especially necessary in light

3

of the two in-depth psychological evaluations that suggest, to the contrary, that Berta presents only a low risk of re-offense.

## I.

We discern the following pertinent facts from the record. We first summarize the circumstances of the crime, Berta's institutional record during his lengthy incarceration, and the psychological evaluations conducted in anticipation of his eligibility for parole.

## A.

At the time of the murder, Berta was a thirty-five-year-old married father of five who earned his living as a self-employed electrician. He and his second wife had a "semi-open" marriage, in that each was free to pursue extramarital affairs.

The victim, C.W.,[1] was a registered nurse. She and Berta had an on-and-off affair over the course of ten years. Their relationship was described as "tumultuous[,] . . . characterized by long-standing emotional abuse[] and financial exploitation."

---

[1] We use initials both out of respect for the victim and in accordance with Rule 1:38-3(c)(12).

4

Witnesses testified at trial that the victim expected Berta to divorce his wife and marry her. She was upset by the fact that Berta was not keeping his promise to do so, and told several friends that she and Berta were "going away together so that they could talk out their problems."

Although Berta and the victim had planned to go on a week-long vacation, he instead went on the vacation with another affair partner, P.B. P.B. testified that on the night of July 9, 1983, while the two were vacationing in Minnesota, Berta "produced a handgun[,]" which he told her "he always carried . . . with him." She testified that, after asking her to confirm that she loved him, Berta told her "I just killed [three][2] people, I'll blow your God damn brains out." P.B. also testified that Berta told her she "did not have to worry about [C.W.] as she was completely out of the picture."

On July 16, 1983, the victim's nude body was found in the bathtub of her home, partially immersed in water. The official cause of her death was cerebral laceration and hemorrhage due to fractured skull, which was, in turn, the result of a single gunshot to the back of the head. The investigation revealed that the murder occurred on July 8, 1983, in the basement of the home.

---

[2] Berta was not charged with killing anyone other than C.W.

A-1889-20

Berta was arrested and charged with knowing/purposeful murder, N.J.S.A. 2C:11-3, and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a).  He was released on bail and remained free during the thirteen-month period between his arrest and trial.  So far as the record shows, he was not charged with committing an offense while on bail awaiting trial.

On October 2, 1984, the jury found Berta guilty of both offenses.  The trial judge merged the two crimes for purposes of sentencing.  Berta had no prior adult convictions or juvenile adjudications of delinquency.[3]  The trial court sentenced him to life imprisonment subject to a mandatory minimum period of parole ineligibility fixed at thirty years.

Berta first became eligible for parole on September 24, 2014.  The Board denied his initial parole application and imposed a 120-month FET.  We affirmed the final decision of the Board in an unpublished decision.  Berta v. N.J. State Parole Bd., No. A-2306-15, 2017 WL 4818714 (App. Div. Oct. 26, 2017).

The FET expired and Berta became eligible for parole on January 31, 2020.  Hearing Officer Theodore Sadiwnyk compiled Berta's pre-parole case

---

[3] The record shows that in April 1973, Berta was arrested for simple assault and criminal mischief.  Those charges were dismissed, however, and did not result in a conviction.

assessment.  That report documented the following factors:  "[n]o prior offense record"; "[i]nfraction free since last panel"; "[p]articipation in program(s) specific to behavior"; "participation in institutional program(s)"; "[i]nstitutional reports reflect favorable institutional adjustment"; "[a]ttempt made to enroll and participate in program(s) but was not admitted"; "[m]inimum custody status achieved and maintained"; and "[r]isk assessment evaluation"; as well as the "[f]acts and [c]ircumstances of the offense(s)[, s]pecifically:  <u>MURDER</u>"  and Berta's "[i]nsufficient problem(s) resolution[, s]pecifically:  denial of [the] offense[,]" as demonstrated by "interview" and "confidential material/professional report[.]"

During the course of thirty-six years of imprisonment, Berta accumulated seven disciplinary infractions.[4]  Six of those occurred within the first five years

---

[4]  Berta's complete disciplinary record following his 1984 incarceration consists of the following infractions:

| May 2, 1986 | .256 Refusing to Obey |
|---|---|
| August 14, 1986 | .210 Possession not Authorized |
| September 19, 1986 | .210 Possession not Authorized |
| October 6, 1986 | .709 Failure to Comply |
| July 21, 1987 | *.205 Misuse of Authorized Medication |
| April 19, 1988 | .256 Refusing to Obey |
| October 30, 2002 | .210 Possession not Authorized |

of his incarceration, including one asterisk offense,[5] *.205, Misuse of Authorized Medication, committed in July 1987. The most recent infraction, dated October 30, 2002, was a non-asterisk offense for .210—"anything not authorized for inmate possession." That latest infraction "was reheard and LOCT[6] was removed."

Berta was not charged with an infraction between April 1988 and the October 2002 infraction. Nor was Berta disciplined during the period between his first and second parole hearings.

The pre-parole case assessment shows that while in prison, Berta worked as "a master electrician and essential member of the maintenance team . . . ." He also engages in counseling with the prison chaplain, Reverend Dr. Lawrence Akins. Reverend Akins wrote a letter in support of Berta's application for parole. The letter praised Berta's active participation in re-entry programs, group counseling, and the Catholic worship community, calling his institutional life "exemplary[.]" Of particular note, Reverend Akins observed that,

---

[5] Under the Department of Correction's regulations on inmate discipline, N.J.A.C. 10A:4-4.1, "[a]sterisk offenses" are prohibited acts considered to be the most serious violations, resulting in the most severe sanctions.

[6] "LOCT" refers to Loss of Commutation Credit, commonly referred to as "good time" credit.

"[b]ecause of his inclination to openly reflect upon his past behavior and negative choices, [Berta] became a conversational catalyst for the rest of the . . . group."  Reverend Akins explained that Berta had

> come to understand the critical nature of accepting personal responsibility for one's choices as a vital step for those striving to progress beyond criminal behavior to engage in productive and fulfilling lives.  I believe Mr. Berta has worked diligently towards genuine, holistic rehabilitation, and will ultimately resume a positive role as a returning citizen if afforded the opportunity.

The pre-parole case assessment shows that Berta actively pursued educational opportunities during his incarceration.  He stayed abreast of changes to the electrical codes in anticipation that he would continue his work as an electrician while on parole.  In 2019, he earned an Associate's degree in Liberal Arts from Raritan Valley Community College.  He also began working towards a Bachelor's degree in Social Justice from Rutgers University through the New Jersey-Step Program.

Although Berta has no history of substance abuse, he also runs the prison's Alcoholics Anonymous program.  Berta told the two-member panel:  "I felt it (AA) would help me because I was[] . . . running around having affairs so I figured I would take the program . . . ."  Berta denied having a problem with sexual addiction or issues "with impulses to gratify [his] sexual needs."

A-1889-20

In advance of both the initial parole hearing and the second parole hearing now before us, the State commissioned in-depth psychological assessments for the purpose of evaluating Berta's suitability for release. Dr. Julia Van Pelt evaluated Berta on May 30, 2014. Dr. Richard Mucowski conducted a psychological evaluation and issued a report with his findings on September 24, 2019.

The two reports made similar findings and reached similar conclusions. On the Level of Service Inventory–Revised (LSI-R), a worksheet designed to predict the risk of an inmate's likelihood to reoffend if released, Berta scored a ten when examined by Dr. Van Pelt, and an eleven when subsequently examined by Dr. Mucowski. Dr. Mucowski's Clinical Summary of In-Depth Psychological Examination noted that those scores are "in the low range . . . ." Dr. Mucowski emphasized in his report that Berta presented only a "low risk" of re-offense, explaining that an LSI-R score of eleven indicates "a low risk for recidivism with a 20% chance of re-arrest and a 13.3% chance of reconviction within two years of release."

Dr. Mucowski also administered MCMI III and STAXI II assessments. He described the STAXI II as "a [fifty-seven-]item . . . scaled assessment instrument that addresses an individual's level of . . . anger . . . ." On that test, Dr. Mucowski

found that Berta's "results show that he scored like individuals who are over controlled in how they present themselves publicly."

Dr. Mucowski described the MCMI III assessment as "a personality inventory that utilizes corrections norms to offer a description of possible clinical syndromes as well as enduring and pervasive personality traits that underlie his emotional, cognitive and interpersonal presentation." Based on that assessment, Dr. Mucowski noted that Berta's profile indicates his responses to the items were "valid" but "distort[ed] . . . ." Based on Berta's "significant effort to present himself in a very positive light, a socially acceptable front and resistance to admit personal shortcomings," Dr. Mucowski explained that "individuals with constellations of scores similar to Mr. Berta's" may try to appear "composed, virtuous and conventional" and might "maintain a passively cooperative attitude, follow regulations carefully, try to avoid trouble, and attempt to make themselves helpful for staff." However, Dr. Mucowski warned "[t]he reader . . . not [to] be fooled" because Berta's outward presentation "is a show" that "hides his narcissism." Because "[c]ondemnation [and disapproval] from others . . . cause him much discomfort," a person with a profile like Berta's "avoids negativism by appearing to be weak, accommodating and overly respectful especially with those in authority."

A-1889-20

Dr. Mucowski nonetheless acknowledged that the MCMI III assessment "reveal[ed] NO major disturbances in the functioning of petitioner's psyche." The report predicted that "[w]ith conformity and sociability as his most prominent traits, Mr. Berta will adhere to the expectations of authorities such as prison administrators . . . ."

Dr. Mucowski added that during the evaluation, Berta had "amazingly denied his guilt for taking the life of his victim and former paramour[,] saying: 'I cannot bring myself to admit to a crime that I did not do." Dr. Mucowski included in his report an excerpt from Dr. Van Pelt's 2014 report documenting the only instance in which Berta admitted his guilt. Dr. Van Pelt's report had indicated that Berta shared with her that

> [H]e was a womanizer, had a mistress, and on one dreadful day made a terrible mistake and ruined [two] families. When asked to clarify the affected people, the inmate said, "mine and [C.W.'s]." Mr. Berta further explained, "We ha[d] been having a disagreement and it became violent." Inquired if their confrontations tended to escalate into the physical level, he denied it being the case and added, "I just killed her." The inmate continued, "She wanted to go on a trip with me, move, and then live on a farm together. She insisted on going but I insisted she did not. I shot her in the head. The weapon was hers. She had a pistol in her house. At first I was in a state of shock and went on a trip. I ended up going with another girlfriend. In the moment of total stupidity I ruined my life and [C.W.'s]."

12

By all other accounts, however, Berta has otherwise steadfastly maintained his innocence.

Dr. Van Pelt's 2014 examination also revealed that, while Berta ostensibly led "a very pro-social life" and had been "held in high regard by his community, it appear[ed] that most of his [good works] had been predominantly fueled by the strong psychopathic traits of [Berta's] personality, including but not limited to elaborate deceit, manipulation, and domination." Dr. Van Pelt's report also highlighted Berta's "persistently shallow and superficial affect during the trial . . . ." Dr. Van Pelt also noted Berta's institutional record contained "notations made of [Berta] being particularly fond of guns in his past, cruelty towards animals, and inclination to prey whenever possible upon vulnerable people around him" which manifested in Berta "often taking advantage of multiple women at a time, sexually and monetarily."

Dr. Mucowski agreed with Dr. Van Pelt's prior conclusion that Berta possessed "psychopathic traits" and "came to the same conclusion" that Berta "presents as . . . Antisocial Personality Disorder, with Pronounced Obsessive Compulsive and Psychopathic Features."

Taking into consideration Dr. Van Pelt's comments, Dr. Mucowski recommended that the Board "confront Mr. Berta on his inconsistency regarding

his admission of guilt for his crime to Dr. Van Pelt and his denial of the crime to Dr. Mucowski." In the final analysis, however, and notwithstanding the "psychopathic" traits that had been revealed, Dr. Mucowski concluded that "there are no psychological contraindications to grant [Berta] parole or other custody status changes, as per discretion of DOC." Dr. Mucowski concluded that, considering Berta's age, his community support (evidenced by the multiple character letters submitted in support of his release), "the likelihood of [Berta] successfully completing a projected term of parole appears positive due to lack of known supervision non-compliance issues." Importantly for purposes of this appeal, neither Dr. Mucowski nor Dr. Van Pelt opined that there is a substantial likelihood that Berta would commit a crime if released on parole.

B.

We next summarize the procedural history leading to the January 27, 2021 final agency decision denying parole and establishing a seventy-two-month FET. On February 5, 2020, Berta appeared virtually before a two-member panel. The panel denied parole, determining that "a substantial likelihood exists that [Berta] would commit a new crime if released on parole at this time." The two-member panel referred the case "to a three-member Panel for the establishment of a FET that may be in excess of institutional guidelines."

14

The Initial Notice of Decision issued by the two-member panel relied upon the same factors that had been compiled in the pre-parole case assessment. As to the mitigating factors, the Initial Notice of Decision specified: "[n]o prior offense record"; [i]nfraction free since last panel"; [p]articipation in program(s) specific to behavior"; "[p]articipation in institutional program(s)"; "[i]nstitutional reports reflect favorable institutional adjustment"; "[a]ttempt made to enroll and participate in program(s) but was not admitted"; "[m]inimal custody status achieved/maintained"; and "[r]isk assessment evaluation."

The Initial Notice of Decision stated two reasons for denying parole: (1) the facts and circumstances of the offense of first-degree murder; (2) insufficient problem resolution, specifically denial of offenses. It additionally noted that Berta admitted to a sexual addiction which has remained untreated and that he "showed no remorse for the victim which seemed unreasonable no matter how she was murdered." The Initial Notice of Decision stated that "[i]nsufficient problem resolution" was demonstrated by the "interview" and "documentation in case file[.]"

The Initial Notice of Decision further explained that the Board's task was to "assess whether you have an understanding to the criminal thinking related to the [m]urder offense. At the hearing, you presented as an individual who denies

any culpability for the crime. You did so regardless of the documented record and a jury finding of guilt."

The Initial Notice of Decision concluded that Berta would not be released on parole because he had not yet "conduct[ed] an introspection to adequately understand all components to [his] psyche and the triggers and stressors that make [him] think or want to think in such a manner. [Berta] must come to an understanding [of] the dynamics to [his] negative thinking."

On April 3, 2020, in response to Berta's letter contesting the factual conclusions of the two-member panel, that panel amended its initial decision to include two additional factors to support the denial of parole: (1) that Berta was "committed to incarceration for multiple offenses" because of the merged murder and possession of a weapon for unlawful purpose offenses; and (2) the seven institutional disciplinary infractions Berta had committed, describing them as "numerous, persistent, [and] serious[.]" Under the section discussing "[i]nsufficient problem(s) resolution[,]" the notice was amended to remove the reference to Berta's sexual addiction and the reference to a "lack of remorse." In place of the original explanation, the amended Initial Notice of Decision noted as "other" that "[i]nmate acknowledges that in the time leading up to the

murder, he was 'out of control' as that relates to interpersonal issues. Inmate needs to address these issues."

Thereafter, a three-member panel concurred with the conclusions of the two-member panel. The principal reason for affirming the parole denial was Berta's continued refusal to admit his guilt. The three-member panel imposed an FET of seventy-two months.

On October 26, 2020, Berta filed an administrative appeal to the full Board. On February 27, 2021, the Parole Board voted unanimously to deny the appeal. In its Notice of Final Agency Decision, the Board summarized Berta's arguments on appeal:

> You contend that the Board panel failed to consider material facts. Specifically, you claim that the Board panel failed to consider that you have maintained your innocence ever since your arrest as you were out of town at the time of the murder and that you were convicted on circumstantial evidence; that you have already served thirty-six years; that you are seventy-one (71) years old and have health issues; that you have participated in almost every therapeutic program offered in the institution and since your last hearing you have completed Focus on the Victim, Cage Your Rage, Smart Recovery and Thinking for a Change, that you have earned an Associate's Degree; and that you have continued your involvement with the 12-Step Recovery Program to address your moral and ethical thinking but that you never stated that you were addicted to sex. You also allege that the Board failed to consider that in thirty-five years in custody you committed only seven

(7) infractions; that your last infraction, .210 Possession not Authorized, was eighteen (18) years ago in 2002 and is a minor infraction; and that your only asterisk infraction, *.205 Misuse Authorized Medication was in 1987, which was related to an expired bubble pack of medication.

The Board then responded to each contention. The Board explained:

[A]s reasons for parole denial: facts and circumstances of offense, specifically, Murder, first degree; committed to incarceration for multiple offenses; and institutional infractions are numerous, persistent, and serious in nature (last infraction: October 30, 2002—.210). Furthermore, based on your responses to questions posed by the Board panel at the time of your hearing and the documentation in the case file, the Board panel determined that you exhibit insufficient problem resolution, specifically, that you deny the crime. The Board panel noted, "Inmate acknowledges that in the time leading up to the murder he was 'out of control' as that relates to interpersonal issues. Inmate needs to address these issues.

In response to Berta's contention that the Board panel had failed to consider the full breadth of his rehabilitative efforts while in prison, the Board found "that the Board panel reviewed [his] entire record in rendering its decision. [Berta's] age and program participation are a matter of record, were noted on the Case Summary at the time of [his] Initial Hearing, and were considered by the Board panel."

18

Regarding Berta's acknowledgment that he was "out of control" at the time of the crime, the Board found that Berta "discussed that [his] sexual behavior was out of control and that [he] hurt a lot of people and that [he] found [his] involvement in the [Twelve]-Step program to be helpful in addressing [his] issues."

In sum, the Board rejected Berta's argument that it had failed to consider all relevant positive evidence in the record pertaining to his suitability for release. The Board explained that it had

> appropriately noted as mitigation on the Notice of Decision[:] no prior offense record; infraction free since last panel; participation in programs specific to behavior; participation in institutional programs; institutional reports reflect favorable institutional adjustment; attempt made to enroll and participate in programs by was not admitted; minimum custody status achieved and maintained; and risk assessment evaluation.

"As a result of" having included the above listed mitigating factors in its initial Notice of Decision, the Board found that "the Board panel did not solely base its decision to deny parole on the negative aspects in the record," but rather "based its decision on the entire record governed by the factors set forth in the statutory requirements and N.J.A.C. 10A:71-3.11."

A-1889-20

In response to Berta's contention that the Board panel unfairly characterized his disciplinary record, the Board explained that it "has the authority and the responsibility to consider [his] commission of serious disciplinary infractions"[7] in its parole determination. The Board found Berta's contentions "without merit" because "the Board panel appropriately considered [his] institutional disciplinary charge of .210 Possession not Authorized which [he] committed on October 30, 2002 and that [he has] acquired a total of seven (7) additional institutional infractions."

The Board also "concur[red]" with the seventy-two month FET imposed by the three-member Board panel "due to [Berta's] lack of satisfactory progress in reducing the likelihood of future criminal behavior . . . ."

This appeal followed. Defendant raises the following contentions for our consideration:

> POINT I
>
> IT WAS AN UNCONSTITUTIONAL EX POST FACTO VIOLATION FOR THE PAROLE BOARD TO CONSIDER INFORMATION OTHER THAN "NEW INFORMATION" WITHIN THE MEANING OF THE APPLICABLE 1979 PAROLE ACT IN

---

[7] We note that although the Board refers to serious infractions in the plural, the record shows that Berta committed only one asterisk offense, *.205–Misuse of Authorized Medication, which occurred in 1987.

A-1889-20

DENYING MR. BERTA'S PAROLE. (Not Raised Below).

## POINT II

IT WAS IMPROPER FOR THE PAROLE BOARD TO CONSIDER AS AN AGGRAVATING FACTOR "COMMITTED TO INCARCERATION FOR MULTIPLE OFFENSES" SIMPLY BECAUSE MR. BERTA HAD A POSSESSION OFFENSE WHICH MERGED WITH HIS MURDER CONVICTION.

## POINT III

DENYING MR. BERTA PAROLE PURELY BECAUSE HE MAINTAINS THAT HE IS INNOCENT OF THE OFFENSES FOR WHICH HE IS INCARCERATED VIOLATES HIS CONSTITUTIONAL DUE PROCESS RIGHTS.

## POINT IV

EVEN IF EVERY FACTOR CONSIDERED BY THE BOARD IS DEEMED APPROPRIATE, THE SUM OF THOSE FACTORS FAIL TO PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THERE IS A SUBSTANTIAL LIKELIHOOD MR. BERTA WILL COMMIT AN OFFENSE IF RELEASED.

## POINT V

THIS COURT SHOULD ORDER MR. BERTA'S IMMEDIATE RELEASE, WHICH IT IS EMPOWERED TO DO. RETROACTIVE APPLICATION OF N.J.S.A. 30:4-123.55(F) TO REQUIRE A REMAND FOR A REHEARING WOULD BE AN UNCONSTITUTIONAL EX POST FACTO VIOLATION.

21

POINT VI

THE PAROLE BOARD ACTED ARBITRARILY
AND CAPRICIOUSLY IN ESTABLISHING A
FUTURE ELIGIBILITY TERM INCONSISTENT
WITH ITS OWN REGULATIONS.

II.

We begin our analysis by acknowledging the legal principles governing this appeal. The scope of our review is narrow. As a general matter, we will disturb an agency's adjudicatory decision only if we determine that the decision is "arbitrary, capricious or unreasonable" or is unsupported "by substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579–80 (1980) (citing Campbell v. Dep't of Civ. Serv., 39 N.J. 556, 562 (1963)). In determining whether an agency action is arbitrary, capricious, or unreasonable, we examine:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [In re Carter, 191 N.J. 474, 482–83 (2007) (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

Relatedly, we are deferential to an agency's expertise. See Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442 (App. Div. 2001) (quotation marks omitted) (quoting In re Vineland Chem. Co., 243 N.J. Super. 285, 307 (App. Div. 1990)) ("[W]here there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs."). With respect to the Parole Board's expertise, we acknowledge that one of its core functions is to evaluate inmates and to make reasoned predictions as to how they will perform if released from prison under the Board's supervision. As our Supreme Court has explained, the Parole Board is "the administrative agency charged with the responsibility of deciding whether an inmate satisfies the criteria for parole release under the Parole Act of 1979." In re Application of Hawley, 98 N.J. 108, 112 (1984).

Although we owe substantial deference to the Board, we emphasize that "our review is not 'perfunctory,' nor is it 'our function . . . merely [to] rubberstamp an agency's decision[.]'" Blanchard v. N.J. Dep't of Corrs., 461 N.J. Super. 231, 237–38 (alterations in original) (quoting Figueroa v. N.J. Dep't of Corrs., 414 N.J. Super. 186, 191 (App. Div. 2010)). Rather, "[w]e are constrained to engage in a 'careful and principled consideration of the agency

record and findings.'" Ibid. (quoting Williams v. Dep't of Corrs., 330 N.J. Super. 197, 204 (App. Div. 2000)).

Importantly, we require an agency to explain its reasoning because that is "[o]ne of the best procedural protections against arbitrary exercise of discretionary power . . . ." Monks v. N.J. State Parole Bd., 58 N.J. 238, 245 (1971) (quoting Kenneth Culp Davis, Administrative Law § 16.12, at 585 (Supp. 1970)). Absent a sufficient statement of reasons, we cannot ascertain whether the Board's decision is justified or arbitrary and capricious. See Mejia v. N.J. Dep't of Corrs., 446 N.J. Super. 369, 378–79 (App. Div. 2016) (reversing and remanding penalty for institutional infraction for failure to provide reasons for particular sanction); Balagun v. N.J. Dep't of Corrs., 361 N.J. Super. 199, 203 (App. Div. 2003) (requiring agency to "disclose its reasons for any decision, even those based upon expertise, so that a proper, searching, and careful review by this court may be undertaken").

We stress, moreover, that our obligation to afford substantial deference to an agency's adjudicatory decision does not force us to turn a blind eye to a post-hoc justification—that is, a reason devised to justify a decision that was already made as a fait accompli for other unstated reasons. Our task is to be neutral

24

reviewers of agency decisions, not apologists for them, and thus nothing prevents us from piercing the veil of an unsupported decision.

Berta's parole is governed by the version of the Parole Act of 1979 (Parole Act or Act), in effect when his crime was committed. The present crime was committed before significant revisions to the Act were adopted in 1997.[8] The statutory text that applies in this case provides that Berta "shall be released on parole at the time of parole eligibility, unless [it is shown] by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime . . . if released on parole at such time." Acoli v. N.J. State Parole Bd., 250 N.J. 431, 455 (2022); see N.J.S.A. 30:4-123.53 (1979). As the Court recently explained in Acoli,

> "Likelihood" is defined as a "probability," or "the appearance of probable success," and substantial" is defined as "considerable in amount" or "being that specified to a large degree." Webster's Third International Dictionary 1310, 2280 (1981). Requiring that the Board show that there is a substantial "probability" that an inmate will reoffend is a fairly high predictive bar that must be vaulted—even though such assessment will defy scientific rigor and involves a certain degree of subjectivity.

[8] Under the current version of N.J.S.A. 30:4-123.53, the Board may deny parole if it is shown by a preponderance of the evidence that an "inmate has failed to cooperate in his or her own rehabilitation or that there is a reasonable expectation that the inmate will violate conditions of parole imposed pursuant to [N.J.S.A. 30:4-123.59] if released on parole at that time."

> This much we can say about the term "substantial likelihood." Assessing the risk that a parole-eligible candidate will reoffend requires a finding that is more than a mere probability and considerably less than a certainty. To be sure, the mere "potential" that an inmate if released may reoffend is not sufficient. See State Parole Bd. v. Cestari, 224 N.J. Super. 534, 550 (1988). Only when the risk of reoffending rises to "a substantial likelihood" may a parole-eligible inmate be denied parole. Ibid.
>
> [250 N.J. at 455–56.].

Under the governing statutory and regulatory framework, once a defendant becomes eligible for parole, he or she is entitled to "a presumption in favor of parole," In re Trantino, 89 N.J. 347, 356 (1982) (Trantino II), and the burden is on "the State to prove that the prisoner is a recidivist and should not be released." Trantino v. N.J. State Parole Bd. 166 N.J. 113, 197 (2002) (Trantino VI) (quoting N.J. State Parole Bd. v. Byrne, 93 N.J. 192, 205 (1983)).

We stress that the presumption of parole is a foundational principle that undergirds the parole release decision and guides our resolution of this appeal. We add that the parole release decision is fundamentally different from the decision made by a trial court when imposing the initial sentence. Although N.J.A.C. 10A:71-3.11(b)(5) authorizes the Parole Board to consider the "[f]acts and circumstances of the offense" as a relevant factor, "'the gravity of the crime'

cannot serve as 'an independent reason for continuing punishment and denying parole' under the 1979 Act. Trantino II, 89 N.J. at 373–74. "That is because the punitive aspects of the sentence have been satisfied by the time the inmate is eligible for parole." Acoli, 250 N.J. at 457; Trantino II, 89 N.J. at 370.

Accordingly, the parole decision is not intended to achieve, for example, just deserts. Nor does not it serve the interests of general deterrence, which is one of the foundational purposes of sentencing. See State v. Locane, 454 N.J. Super. 98, 122 (App. Div. 2018) (explaining that sentencing courts "focus on the severity of the crime . . . to assure the protection of the public and the deterrence of others. The higher the degree of the crime, the greater the public need for protection and the more need for deterrence[]" (quoting State v. Megargel, 143 N.J. 484, 500 (1996))). The parole release decision, rather, revolves solely around the likelihood that the inmate, if released, would commit a future crime. See McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 565 (App. Div. 2002) ("[T]he Board [must] focus its attention squarely on the likelihood of recidivism.").

Overcoming the presumption of parole is a "highly predictive" determination, Thompson v. N.J. State Parole Bd., 210 N.J. Super. 107, 115 (App. Div. 1986) (quoting Beckworth v. N.J. State Parole Bd., 62 N.J. 348, 359

(1973)), which must take into account "the aggregate of all of the factors which may have any pertinence." Beckworth, 62 N.J. at 360. N.J.A.C. 10A:71–3.11(b) contains a non-exhaustive list of factors that the Board must consider in determining whether an inmate should be released on parole. Among those enumerated pertinent factors are "[s]tatements by the inmate reflecting on the likelihood that he or she will commit another crime; the failure to cooperate in his or her own rehabilitation; or the reasonable expectation that he or she will violate conditions of parole[,]" as well as "any other factors deemed relevant[.]" N.J.A.C. 10A:71–3.11(b)(17).

In this case, we address not just the Board's decision to deny parole but also its decision to impose a seventy-two-month FET. An inmate serving a murder sentence is presumptively assigned a twenty-seven-month FET after a denial of parole. See N.J.A.C. 10A:71–3.21(a)(1). Pursuant to N.J.A.C. 10A:71-3.21(d), the Board is authorized to set a higher FET "if the future parole eligibility date which would be established pursuant to [N.J.A.C. 10A:71-3.21(a)] is clearly inappropriate due to the inmate's lack of satisfactory progress in reducing the likelihood of future behavior." (emphasis added). N.J.A.C. 10A:71-3.21(d) also provides that the FET "may be increased or decreased by up to nine months when, in the opinion of the Board panel, the severity of the

crime for which the inmate was denied parole and the prior criminal record or other characteristics of the inmate warrant such adjustment."

III.

In <u>Acoli</u>, our Supreme Court recently reaffirmed foundational principles that guide appellate review of Parole Board decisions for inmates who are subject to the pre-1997 version of the Parole Act. 250 N.J. at 454–55. <u>Acoli</u> is especially instructive for purposes of this appeal because that case hinged on the Board's finding that Acoli "lacks insight into the conduct that led him to his involvement in the crimes he committed in 1973 and that he still refuses to take responsibility for his acts." 250 N.J. at 443. That critical finding in <u>Acoli</u> is similar in important respects to the Board's finding in the case before us: that Berta's unwillingness to admit his guilt constitutes "negative thinking" and "insufficient problem resolution" that militates against his release.[9]

---

[9] We note the distinctly different circumstances that distinguish Berta's refusal to admit his guilt from Acoli's refusal to accept responsibility. As the dissenting justices stressed, not only did Acoli maintain before the Parole Board that he did not commit the murder of a State Trooper, he took the additional step of speculating that the Trooper could have been killed by "friendly fire." Furthermore, Acoli "cast himself as the victim in the incident and recounted a theory that the evidence completely discredits." <u>Acoli</u>, 250 N.J. at 482–83 (Solomon, J., dissenting). We add that Acoli's acceptance of responsibility was relevant to whether he was sincere in his renunciation of violence as a means to achieve social change. That circumstance is not present in the matter before us.

29

Given these similarities, we deem it appropriate to review the Acoli decision in detail. We do so because we are convinced that the Supreme Court intended to provide guidance and instruction—to the Parole Board and appellate courts as well—on how to resolve remaining cases in the pipeline that apply the parole standards under the pre-1997 version of the Parole Act. The Court ultimately concluded that the Board had abused its discretion in failing to grant Acoli parole in accordance with N.J.S.A. 30:4-123.53 because its "decision . . . [was] not supported by substantial evidence in the record or by a reasonable weighing of the relevant factors in N.J.A.C. 10A:71-3.11(b)." Acoli, 250 N.J. at 448.

Acoli had been convicted of participating in notorious crimes, shooting and wounding one New Jersey State Trooper and murdering a second Trooper during a routine traffic stop. Id. at 440. Acoli was sentenced to life imprisonment plus twenty-four to thirty years. Id. at 440–41. He first became eligible for parole in 1993. Id. at 441. The Board denied parole on every subsequent occasion he became eligible for release. Id. at 428.

Acoli committed no disciplinary infractions during the last twenty-five years of his imprisonment. Id. at 467. At the time of his latest appeal, he was on "honor status." Ibid. During his time in prison, Acoli participated in over

120 rehabilitative and behavioral programs, underwent counseling and learned a new trade.  Id. at 464.  Positive testimonials from the Federal Bureau of Prisons praised Acoli's coping skills, noting his psychological progress and positive rapport with others.  Id. at 468.

Acoli's institutional record contained numerous psychological reports and evaluations.  Id. at 441.  In preparation for his third parole hearing, "the State assigned Dr. Lois D. Goorwitz, a licensed psychologist, to assess Acoli's institutional progress."  Id. at 443.  Dr. Goorwitz remarked in her report that Acoli "was 'very cooperative, self[-]reflective, thoughtful, and non[-]defensive.'"  Ibid. (alterations in original).  The Court noted:

> Dr. Goorwitz found "NO psychological contraindications to granting parole." . . . She assessed his risk of recidivism as "moderate," only twenty-eight percent.  Dr. Goorwitz emphasized that Acoli's "mental health treatment" and the maturity he gained through the years had resulted not only "in significant self[-]growth," but also in his "ability to take responsibility for his crimes."  She also stressed that he had "significantly changed views on politics and the use of violence."  She concluded that "it is time to seriously consider [Acoli] for parole."
>
> [Id. at 444 (alterations in original).]

In anticipation of his fourth parole eligibility hearing, slated for 2016, "the Board retained the services of Dr. Julia Van Pelt, for the purpose of conducting

31

and in-depth psychological evaluation and issuing a report of Berta's psychological state. Id. at 446. Although Acoli's institutional record had remained unblemished during the six-year interim since he last became eligible for parole,

> Dr. Van Pelt arrived at completely different conclusions from those reached by Dr. Goorwitz. The same exact responses that Dr. Goorwitz credited as sincere six years earlier, Dr. Van Pelt rejected as inauthentic. After listening to Acoli's account of what occurred in 1973, Dr. Van Pelt opined that Acoli failed to take responsibility for his actions. She did not accept as genuine Acoli's expressions of remorse and his verbal renunciation of violence as a vehicle for social change. In Dr. Van Pelt's view, Acoli had an "inability . . . to at least superficially condemn violence" and appears to "at least passively condone aggression."
>
> [Ibid. (alteration in original).]

Ultimately, "Dr. Van Pelt assessed Acoli as presenting a low to moderate risk of recidivism. She did not render an opinion that there was a substantial likelihood that Acoli would reoffend if released." Ibid. However, she did opine that Acoli would "struggle to abide by the restrictions of parole . . . ." Id. at 435.

During his parole hearing, the Board subjected Acoli to six hours of questioning. Id. at 461. "Acoli fielded hundreds of questions, most of which required him to repeat again and again his recollection of the events" in the early morning of the day he committed his crime, May 2, 1972. Ibid. The Court noted

32

that "[a]lmost no inquiry was made about his exemplary record over the last twenty-five years, his successful completion of programs, his institutional achievements, his fading health, or his prospects in the future." Id. at 437.

The Board again denied parole, finding in its Notice of Decision that Acoli had made "negligible gains in understanding [his] past behaviors, values and attitudes" because of his refusal to "surrender views about 'social justice'" during his parole hearing. Id. at 466. The Board ignored multiple favorable psychological reports, including Dr. Goorwitz's 2010 recommendation that the Board "seriously consider" Acoli's release because "there were 'NO psychological contraindications to granting parole[.]" Id. at 468. The Notice of Decision did not explain why it weighed Dr. Van Pelt's negative report so much more heavily than Dr. Goorwitz's positive one. Ibid. Nor did it address the significance of Acoli's age, which predicted an extremely low likelihood of recidivism. Id. at 469.

Based on these circumstances, the Supreme Court determined that in denying parole, the Board had "taken refuge in threadbare findings that Acoli lacks insight into the conduct that led him to his involvement in the crimes he committed in 1973 and that he still refuses to take responsibility for his acts." Id. at 460. The Court added that in finding that there was a substantial likelihood

33

that Acoli would reoffend if released on parole, the Board "overvalued the sole unfavorable psychological report and completely disregarded the positive psychological assessments"; "gave little weight to Acoli's exemplary institutional record and model-inmate status over twenty-five years"; and "gave no consideration to the age-crime curve—that as an inmate approaches later stages of life, the likelihood of committing a crime greatly diminishes." Ibid.

The Court also determined that the Board in its response to Acoli's appeal "paid lip service to" N.J.A.C. 10A:71-3.11(b) by "cursorily enumerat[ing] some generic mitigating factors" and failing to "substantively address Acoli's twenty-plus year exemplary institutional record." Id. at 465.

The Court added:

> In the end, however, even Dr. Van Pelt's report does not support the Board's denial of parole. Her low-to-moderate-risk assessment concerning the likelihood of Acoli's recidivism does not equate to a substantial likelihood of committing a crime. A single unfavorable psychological evaluation finding only the "potential" to reoffend is insufficient to support the denial of parole. See Cestari, 224 N.J. Super. at 550. The Board, moreover, may not rely on a single unfavorable psychological report, in disregard of evidence favorable to parole, to reach a preferred outcome. See Trantino VI, 166 N.J. at 174, 188; see also Cestari, 224 N.J. Super. at 550.
>
> [Id. at 469.]

34

The Court thus concluded that

> the Parole Board's decision to deny Acoli parole is not supported by substantial evidence in the record or by a reasonable weighing of the relevant factors in N.J.A.C. 10A:71-3.11(b) that govern parole. See Trantino IV, 154 N.J. at 24. Even under the most deferential standard of review, the Board has failed to prove by a preponderance of the evidence that there is a substantial likelihood that, if released on parole, Acoli will commit a crime. Indeed, the Board's decision is so wide of the mark and "manifestly mistaken" that the "interests of justice" require our intervention. See Trantino VI, 166 N.J. at 192 (quoting P.F. v. Div. of Dev. Disabilities, 139 N.J. 522, 530 (1995)).
>
> [Id. at 470.]

## IV.

Turning to the matter before us, we first address Berta's contention that it was improper for the Board to consider as an aggravating factor that he was imprisoned for committing multiple offenses.[10] In this instance, a jury found Berta guilty of murder and possession of a firearm for an unlawful purpose. The firearm was the murder weapon and the unlawful purpose for which it was

---

[10] We address defendant's contentions out of order from the points raised in his brief because our resolution of his "multiple offense" contention and our conclusion that the Board improperly considered his disciplinary infraction history as an aggravating factor make it unnecessary for us to reach the argument raised in his first Point that his rights under the ex post facto clause were violated by the Board's consideration of information that existed before its initial decision to deny parole in 2010. See infra section VI.

possessed was to commit the murder. Although the Parole Board acknowledged that the two jury trial convictions had been merged for sentencing purposes, it nonetheless concluded that Berta had been committed to incarceration for multiple offenses, militating against parole. We disagree with that conclusion.

The list of enumerated relevant factors set forth in N.J.A.C. 10A:71-3.11 does not include that the inmate was committed to incarceration for multiple offenses. We recognize, however, that the list is not exhaustive and that the regulation expressly provides that "in addition, [the Parole Board] may consider any other factors deemed relevant." N.J.A.C. 10A:71-3.11(b). However, we do not believe it is appropriate for the Parole Board to have determined that Berta was committed to incarceration for "multiple offenses" that had been merged for sentencing purposes by the trial court. We note that another enumerated factor authorizes the Board to consider a "[s]tatement by the court reflecting the reasons for the sentence imposed." N.J.A.C. 10A:71-3.11(b)(20). In this instance, the Board effectively disregarded the trial court's explicit, well-reasoned determination that the two convictions must be merged.

Aside from essentially disregarding the trial court's ruling, it is simply inaccurate to say that Berta was "committed to incarceration for multiple

offenses."[11]  This is not a situation where a defendant is convicted of multiple crimes, separate sentences are imposed by the trial court on each conviction, and the court orders those sentences to be served concurrently.  See N.J.S.A. 2C:44-5 (explaining when sentences run concurrently or consecutively, as determined by the sentencing court).  Berta was committed to incarceration by the trial court by means of the Judgment of Conviction (JOC), which shows that the offenses were merged.  The merger of the jury trial convictions, in other words, occurred before the commitment to incarceration.

We are constrained to note that the two-member panel added this supposed aggravating circumstance only after Berta had challenged the Initial Notice of Decision.  We accept that a panel has the authority to amplify its initial decision in response to an inmate's challenge to findings and circumstances that had been made by and relied upon by the panel.  In this instance, however, the panel was neither explaining nor amplifying the findings it had already made, but rather introduced two entirely new circumstances into the mix.  That might suggest that the panel was looking for new reasons to justify a "preferred outcome," to borrow the phraseology the Court used in Acoli.  250 N.J. at 469.  In any event,

---

[11]  The three-member panel's August 7, 2020 Narrative Notice of Decision cites as a factor, "COMMITTED TO INCARCERATION FOR MULTIPLE OFFENSES."

we conclude the Parole Board was manifestly mistaken in citing to and relying on the fact that Berta had been committed to incarceration for multiple offenses. See Trantino VI, 166 N.J. at 192.

## V.

We next consider whether the Parole Board properly considered Berta's record of institutional infractions as an aggravating circumstance militating against parole.[12] On April 3, 2020, the two-member panel amended its decision to add as a reason for denial that Berta had "institutional infractions: numerous,

---

[12] We note that Berta in his appellate brief does not devote a separate point to challenging the Board's consideration of his disciplinary record. However, in Point IV of his brief, Berta contends that "the record relied on by the Board . . . fails to supply the preponderance of evidence necessary for demonstrating a 'substantial likelihood' of future criminal conduct." He then lists the "several reasons [that] were given for the denial of Mr. Berta's parole," including "(3) that he committed 'numerous,' 'persistent,' and 'serious' infractions while in prison . . . ." Berta argues, "[t]hese factors, taken together, are woefully insufficient to justify the Parole Board decision." He also contends, "[w]ith respect to the second and third reasons given for Mr. Berta's parole denial (incarceration on multiple offenses and the various prison infractions) . . . , they are improper and should not have been considered." (emphasis added).

We therefore address whether the Board properly considered Berta's record of disciplinary infraction as part of the preponderance of the evidence the Board relied upon to deny parole. We note that our conclusion that the Board improperly found Berta's institutional infraction history constitutes an aggravating circumstance supports our determination in section VI that Berta's ex post facto contention is not ripe for our consideration. See supra note 4.

persistent, serious." Although we are mindful of the Board's expertise in evaluating the significance of an inmate's institutional record, we deem it appropriate to be especially careful when scrutinizing a new reason for denying parole that was not part of the pre-parole case assessment[13] and that was added to the mix only after an inmate challenges an Initial Notice of Decision. We believe that in those circumstances, in applying the deferential standard of review, closer appellate scrutiny is warranted to guard against post-hoc justifications designed to achieve a "preferred outcome." Cf. id. at 469.

As we have noted, Berta accumulated a total of seven disciplinary infractions. Six of those occurred within the first five years of his incarceration, including the sole infraction deemed to be an asterisk offense, *.205 Misuse of Authorized Medication, which was committed in July 1987. Berta's last infraction, dated October 30, 2002, was a non-asterisk offense, .210 Possession not Authorized. That infraction was reheard and lost commutation credits were restored.

---

[13] The pre-parole case assessment's only reference to Berta's institutional infraction record, beyond listing the offenses and corresponding dates, is that he was "[i]nfraction free since last panel." That report also indicates that Berta's "[i]nstitutional reports reflect favorable institutional adjustment."

 A-1889-20

Berta was not disciplined during the period between his first and second parole hearings. Indeed, so far as the record shows, he has not been charged with or convicted of an institutional infraction for nearly twenty years.

We are satisfied that Berta's disciplinary history, viewed in its entirety and considering the temporal remoteness of the infractions, cannot reasonably be deemed to suggest a likelihood of reoffending, and thus should not have been considered to be a negative circumstance militating against parole. While there was a pattern of infractions at the beginning of Berta's incarceration, only one infraction rose to the level of an asterisk offense, and that infraction, committed in July 1987, "was related to an expired bubble pack of medication."

But even were we to accept that Berta's infraction history is serious, we deem it inaccurate and unreasonable to characterize the infractions as persistent. The word persistent implies continuing without change. That term hardly describes Berta's overall history of infractions, at least in a negative sense. We presume Berta's recent infraction-free history is more probative of the likelihood of re-offense than his temporally remote infraction history. The Board has presented no empirical or even anecdotal evidence to support the counter-intuitive notion that a temporally remote pattern of persistent infractions is a better predictor of future recidivism than a far more sustained recent pattern of

40

infraction-free conduct. See infra note 18 (recognizing that reference to social science studies can be relevant in determining whether an agency decision is supported by substantial credible evidence). The whole point of prison-based "correctional" programs, after all, is to change the thinking and behavior of persons convicted of serious crimes warranting imprisonment. We believe a sustained improvement in institutional behavior is a positive circumstance that should be rewarded so as to provide incentive for inmates to refrain from committing infractions. For purposes of this appeal, we believe a more recent pattern of sustained infraction-free conduct suggests that an inmate will be willing and able to comply with parole rules just as he or she has learned to comply with prison rules.

Nothing in the Board's Final Decision explains why, based on the Board's expertise, that seemingly common-sense principle is wrong. In the absence of any explanation contradicting that precept, we hold that the Board was unreasonable in relying on Berta's disciplinary record to support the conclusion that he is substantially likely to commit a new offense if released on parole.[14]

---

[14] We note that the pattern of Berta's compliance with institutional rules is similar to the pattern in Acoli. Both Berta and Acoli accumulated infractions early in the course of their life sentences, followed by a sustained period of infraction-free behavior. See Acoli, 250 N.J. at 441. Both had only one serious

In sum, the Board's Final Decision refers in a conclusory fashion to Berta's institutional infraction record but does not explain why, viewed as a whole, that record constitutes a negative factor rather than a positive or neutral one. We thus conclude that the Board's consideration of Berta's disciplinary record—added to the mix seemingly as an afterthought—was arbitrary and unreasonable.

## VI.

We turn next to Berta's contention that the Board violated his rights under the ex post facto clause by considering negative information other than "new information" added since he was first denied parole. Under the Parole Act as it existed when the murder in this case was committed, the Board could deny parole after an initial denial only based upon new information added to the record since the preceding parole hearing.[15] The Act was amended in 1997 to

---

infraction. (Acoli was administratively convicted of attempted escape, which would seem to be an especially serious infraction). Ibid. Neither committed an infraction in the last twenty years. See id. at 443.

[15] Specifically, the original version of the 1979 Parole Act read:

> An inmate shall be released on parole on the new parole eligibility date unless new information filed pursuant to a procedure identical to that set forth in [N.J.S.A. 30:4-123.54 (pre-parole report)] indicates by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole at such time.

A-1889-20

remove that restriction so that, now, the Board may consider all available information. N.J.S.A. 30:4-123.56(c). Berta argues that the second denial of parole—the matter before us in this appeal—relies on facts constituting negative circumstances that had previously been considered at the first hearing.

In Trantino v. N.J. State Parole Bd. (Trantino V), we held that the retroactive application of the 1997 amendment to N.J.S.A. 30:4-123.56(c) "did not violate the ex post facto clause since this change in the law is a procedural modification that does not constitute a substantive change in the parole release criteria." 331 N.J. Super. 577, 610–11 (App. Div. 2000) (citing State v. Muhammad, 145 N.J. 23, 56–57 (1996)). We added, "[m]oreover, we are persuaded that much of the additional information considered by the Board at the remand hearings was, arguably, "new information" and could be considered by the Board even under the pre-1997 version of N.J.S.A. 30:4-123.56(c)." Id. at 611.

Berta now claims that our decision in Trantino V has been overruled by Holmes v. Christie, 14 F.4th 250 (3d Cir. 2021). In that case, which involves a civil rights claim pursuant to 42 U.S.C. §1983, the Third Circuit Court of

[N.J.S.A. 30:4-123.56(c) (1979) (emphasis added).]

Appeals held that retroactive application of the 1997 amendment would violate the ex post facto clause if discovery were to show "that the Board implemented the all-information provision in a way that created a significant risk of prolonging [the inmate's] incarceration,"—a "fact-sensitive inquiry." Id. at 260 (quoting Richardson v. Pa. Bd. of Prob. & Parole, 423 F.3d 282, 291 (3d Cir. 2005)).

In the matter before us, the negative information relied on by the Board that does not constitute "new information"[16] relates specifically to the Board's findings that Berta was committed to incarceration for multiple offenses and that he has a serious and persistent history of institutional infractions, all of which occurred before the first parole hearing. We have already determined that both of those negative circumstances were improperly considered and may not be considered on remand.

In these circumstances, we decline to address Berta's constitutional argument because we have already precluded the Board from considering these

---

[16] For purposes of the "as applied" ex post facto analysis in Holmes, we believe Berta's continuing refusal to admit his guilt constitutes "new information" developed since his initial denial of parole. The record before us makes clear that the Board's most recent conclusion that Berta demonstrated insufficient problem resolution was based on his present (i.e., post-initial hearing) denial of guilt, not on his historical protestations of innocence.

two negative circumstances, relying on non-constitutional grounds. See Comm. to Recall Menendez v. Wells, 204 N.J. 79, 95 (2010) (As a general principle, courts "strive to avoid reaching constitutional questions unless required to do so"); Randolph Town Ctr., L.P. v. Cnty. of Morris, 186 N.J. 78, 80 (2006) ("Courts should not reach a constitutional question unless its resolution is imperative to the disposition of litigation."). Applying that principle of constitutional avoidance, we offer no opinion on whether Holmes overturned Trantino V.

## VII.

We next address Berta's contention that it was inappropriate for the Board to base its decision on the fact that he maintains his innocence. In addressing this argument, we are mindful that history shows that innocent persons can be convicted and sentenced for murders they did not commit. Nor do we dispute Berta's assertion that inmates who profess their innocence may face a Kafkaesque dilemma when they become eligible for parole: abandon their claim of innocence or else risk denial of parole on the grounds that they have not accepted responsibility and thus have not sufficiently resolved the problems that lead to criminal behavior. See Daniel S. Medwed, The Innocent Prisoner's

A-1889-20

Dilemma:  Consequences of Failing to Admit Guilt at Parole Hearings, 93 Iowa L. Rev. 491, 529 (2008).

We nonetheless stress that, for purposes of this appeal, we presume that Berta is guilty of the horrific crime for which he was convicted.  We reject Berta's argument that the Parole Board's consideration of his denial of guilt violates his due process rights, and we decline Berta's request that we adopt a per se rule that would categorically preclude the Parole Board from considering this circumstance.

We likewise decline Berta's invitation to "adopt a per se rule that an assertion of innocence as to the underlying offenses, in and of itself, is not sufficient to demonstrate a substantial likelihood of re-offense under the 1979 Act."  Although we do not adopt any such categorical rule, we reiterate that an admission of guilt is not a prerequisite to parole, and thus ongoing refusal to admit guilt cannot be treated as a categorical bar to parole.  Acoli, 250 N.J. at 452.  Confession may well be good for the soul, but it is not a precondition to release from prison.  See N.J.A.C. 10A:71-2.11.  Nor is the refusal to admit guilt a talisman before which the statutory presumption of parole evaporates.  We stress that while an inmate's "insufficient problem resolution" is a relevant circumstance that may be considered by the Board as part of the totality of

positive and negative relevant circumstances, problem resolution is not an end unto itself. Rather, in the context of the parole decision-making framework, it is a means to reduce the likelihood of re-offense. We thus hold that an inmate's contention that he or she is innocent of the crime(s) for which he or she has been imprisoned may be considered, but only insofar as it pertains to the foundational question of whether there is a substantial likelihood that he or she will reoffend. To the extent the Board may have tacitly adopted a de facto policy not to grant parole to inmates who refuse to admit to committing the crime(s) for which they were convicted and incarcerated, we hold that any such categorical policy would violate the presumption of parole and thus constitute an abuse of discretion.

But, even accepting that "insufficient problem resolution" or "negative thinking" can be a relevant consideration, our principal concern in this case is that the Board has not explained why Berta's refusal to acknowledge his guilt translates into a substantial likelihood that he would re-offend. The Board's analysis is superficial and conclusory. While we acknowledge the Board's expertise in addressing inherently subjective questions, we need not defer to what is tantamount to a "net" opinion, that is, one that does not explain the basis for the conclusion. Cf. Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008) (citations omitted) (The net opinion rule "forbids the admission into evidence of

47

an expert's conclusions that are not supported by factual evidence or other data." The "operative rule . . . requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion."). The fact that the assessment of an inmate's negative attitudes and problem resolution is inherently subjective does not exempt that assessment from meaningful appellate review. Nor does the deferential nature of our review excuse the Board from explaining why its subjective assessment supports the ultimate conclusion that there is a substantial likelihood that the inmate will reoffend.

Neither of the two psychologists retained by the Board opined that there is a substantial likelihood that Berta will reoffend. Indeed, the battery of psychological evaluations they performed concluded otherwise. Notably, the LSI-R score indicates a <u>low</u> risk for recidivism.[17] The latest MCMI III evaluation indicates that Berta would "adhere to the expectations of authorities such as prison administrators." Dr. Mucowski's 2019 psychological report indicates that there are "NO psychological contraindications to grant parole," and he concluded that "the likelihood of [Berta] successfully completing a projected term of parole appears positive."

---

[17] In <u>Acoli</u>, Dr. Van Pelt found a "low-to-moderate risk of recidivism," prompting the Court to comment that such a finding "does not equate to a substantial likelihood of committing a crime." 250 N.J. at 469.

If the Board is to part company with these professional assessments, it must explain the reasons for doing so given that it bears the burden of overcoming the presumption of parole by a preponderance of the evidence. We note in this regard that the Board has cited no social science research to support its conclusion that Berta's refusal to admit his guilt presages future criminal activity.[18] Cf. Deal v. Mass. Parole Bd., 142 N.E.3d. 77, 88 (2020) (Gants, C.J., concurring) (citing sex offender recidivism studies concluding that denial of guilt "had little or no relationship with recidivism"); Medwed, 93 Iowa L. Rev. at 536 (noting that in a study of 144 inmates who were labeled "high-risk" due to their denial of having committed offenses, only one reoffended, in comparison to seventeen reoffenders out of group of ninety-seven "non-deniers").

In Acoli, the Court chastised the Board for having "taken refuge in threadbare findings that Acoli lacks insight into the conduct that led him to his involvement in the crimes he committed in 1973 and that he still refuses to take

---

[18]   We do not mean to suggest that the Board's assessment of inherently subjective circumstances—such as negative thinking or insufficient problem resolution—must be supported by peer-reviewed social science. Our point, rather, is that an agency's reliance upon social science research to support its conclusion may be relevant to our own determination of whether an agency decision is supported by substantial credible evidence.

responsibility for his acts." 250 N.J. at 460 (emphasis added). The Board's findings in the matter before us are similarly threadbare, at least with respect to the nexus between Berta's refusal to accept responsibility for the murder he committed and the likelihood he will commit a new crime after all these years.

Because psychological evaluations are individualized and intensely fact-sensitive, and because this is only the second time that Berta was denied parole, in contrast to the litany of denials in Acoli,[19] we choose to provide the Board an opportunity to explain why, considering the totality of relevant circumstances militating in favor of parole, Berta's ongoing protestation of innocence supports the conclusion by a preponderance of the evidence that there is a substantial likelihood that he will reoffend. We emphasize that we are not usurping the Board's role as factfinder with respect to Berta's attitude, problem resolution, or acceptance of responsibility. Rather, our task is to hold the Board accountable for fulfilling that function by requiring it to explain how it assessed these subjective circumstances and arrived at its conclusion with respect to the risk of re-offense. We believe Acoli, which was decided while the present matter was on appeal, sent a clear message that the Board will heed going forward. For that

---

[19] In Acoli, the inmate was denied parole four times before the Court eventually ordered his release.

A-1889-20

reason, we do not retain jurisdiction. We expect the Board to act in good faith in fulfilling its responsibilities on remand, and that if it determines that Berta's refusal to admit guilt—the sole remaining negative circumstance after our decision—does not establish by a preponderance of the evidence that Berta is substantially likely to reoffend, it will grant him parole of its own accord and without the need for further appellate review. We direct that the remand be completed within sixty days.

We add that the Court in Acoli noted that "advanced age . . . is another highly relevant factor in determining whether the Board abused its discretion in denying parole." 250 N.J. at 469. The Court commented that "[n]othing in the Parole Board's decision suggests that the Board considered in any meaningful way the studies on the age-crime curve in denying parole to Acoli." 250 N.J. at 470. Although Berta is significantly younger than Sundiata Acoli, he nonetheless is old enough that his age is a relevant consideration in predicting the likelihood of recidivism. The Court in Acoli explained:

> Studies have shown that as individuals age, their propensity to commit crime decreases and, in particular, that elderly individuals released from prison tend to recidivate at extremely low rates.
>
> Significantly, inmates released at age sixty-five or older had only a 6.5 percent rate of incurring a new conviction and only a 4.1 percent rate of

A-1889-20

reincarceration. Acoli is in an advanced age group for which there is not a comparable statistical cohort. Suffice it to say, a 4.1 percent rate of reincarceration—without regard to any other factors that might militate toward denying parole—can hardly equate to a substantial likelihood of reoffending.

[Id. at 469–70 (citations omitted).]

Accordingly, we instruct the Board to account specifically for Berta's age, along with all relevant mitigating circumstances, in determining whether—and, if need be, explaining why—the preponderance of the evidence establishes a substantial likelihood that he will re-offend.

## VIII.

Finally, we address Berta's contention that the Board improperly imposed a seventy-two-month FET. Most published precedents focus on the propriety of the Board's decision to deny parole, not on the propriety of the FET established at the time parole is denied. We believe the Board's obligation to explain the reasons for imposing an FET longer than the presumptive FET is no less important than its obligation to explain the reasons for overcoming the presumption of parole. We conclude that, in this instance, the Board failed to adequately explain why it fixed an FET almost three times as long as the presumptive twenty-seven-month FET imposed by N.J.A.C. 10A:71-3.21(a).

52

As we have noted, pursuant to N.J.A.C. 10A:71-3.21(d), the Board is authorized to set a higher FET "if the future parole eligibility date which would be established pursuant to [N.J.A.C. 10A:71-3.21(a)] is <u>clearly inappropriate</u> due to the inmate's lack of satisfactory progress in reducing the likelihood of future behavior."  (emphasis added).  We view the "clearly inappropriate" standard to be a high threshold to vault.  The presumption that convicted murderers denied parole should be given a twenty-seven-month FET is not to be dispensed with for light or transient reasons. We hold that to impose a higher FET, the Board must overcome the presumption by explaining <u>why</u> a twenty-seven-month FET is clearly inappropriate.  <u>Cf.</u> <u>Monks</u>, 58 N.J. at 245 (noting that requiring the Parole Board to explain its reasoning is "[o]ne of the best procedural protections against arbitrary exercise of discretionary power."). Furthermore, we hold that the Board must explain not only why the presumptive FET is clearly inappropriate, but also why the FET that was actually imposed is necessary and appropriate.  The Board cannot simply pick a number out of thin air.

At the risk of undue repetition, we stress that:  (1) an FET must not be imposed as a form of punishment; and (2) the decision to impose an FET beyond the presumptive FET, like the underlying decision to deny parole, must be tied

directly to the goal of reducing the likelihood of future criminal behavior. In practical effect, an FET is comparable to a term of parole ineligibility imposed by a court. But unlike sentencing judges—who impose mandatory or discretionary periods of parole ineligibility for purposes of punishment—the Parole Board may only impose a de facto term of parole ineligibility as may be needed to reduce the likelihood of future criminal behavior.

As we have noted, the "punitive aspect" of an inmate's sentence has already been satisfied by the time he or she first becomes eligible for parole. See Acoli, 250 N.J. at 457 (citing Trantino II, 89 N.J. at 373–74). Relatedly, "[a]n inmate's progress or lack of progress toward rehabilitation is relevant only to the extent it bears on whether there is a substantial likelihood that he [or she] will reoffend if released." Ibid. (explaining N.J.A.C. 10A:71-3.11(b)(9) (failure "to cooperate in his or her own rehabilitation")). We emphasize in this regard that N.J.A.C. 10A:71-3.21(d) authorizes the Board to set a higher FET "if the future parole eligibility date which would be established pursuant to [N.J.A.C. 10A:71-3.21(a)] is clearly inappropriate due to the inmate's lack of satisfactory progress in reducing the likelihood of future behavior." (emphasis added).

In this instance, the Board adopted the finding of the three-member panel that "the factors supporting the denial of parole, collectively, are of such a

serious nature as to warrant the setting of a future eligibility term which differs from the presumptive term of twenty-seven (27) months (± [nine] months)."[20] The Board, in other words, essentially incorporated the reasons it had relied upon to deny parole, labeled those collective reasons as "serious" in nature, and then re-purposed them to nearly triple the presumptive FET. The Board's analysis with respect to the FET thus suffers from the same flaws that we have already identified with respect to the Board's underlying decision to deny parole.

---

[20] We note the Board also embraced the findings of the three-member Board panel that:

> after thirty-five (35) years of incarceration:
>
> • You have identified a contributory factor of your criminal thinking. Your desire for self-gratification led to the Murder offense occurring. The Board panel finds you must develop a deeper understanding as to why personal gratification dictated your life. You behaved in such a manner no matter what the consequences were or who you affected in a negative way. You must conduct an introspection to understand the emotional and psychological dynamics of your thinking; and
>
> • You present as not having made adequate progress in the rehabilitative process. The Board panel notes your participation in programming/counseling including Alcoholics Anonymous, Focus On The Victim, Thinking For a Change, Cage Your Rage, STARS and college programs. However, the Board panel finds that further programming will assist you in gaining a better understanding to your thinking.

A-1889-20

Indeed, the Board's decision to impose a seventy-two-month FET compounds the deficiencies in its analysis and articulation of the parole-release decision.

As we have noted, the record clearly shows that in setting an FET beyond the presumptive FET, the Board incorporated and relied upon the "factors supporting the denial of parole, collectively[.]"  We thus presume the FET decision was strongly influenced, if not driven, by Berta's refusal to admit his guilt.  We are concerned that this circumstance might suggest that regardless of any rehabilitative programs Berta participates in, he will not be released from prison unless and until he abandons his claim of innocence.  For the reasons we explained in section VIII of this opinion, that result is not acceptable, especially in the absence of social science evidence to support the proposition tacitly relied upon by the Board that denial of guilt correlates to the risk of re-offense.  See supra note 18.  We reiterate that Berta's admission that he committed the murder is not a prerequisite to parole.  Nor is it a prerequisite to imposing the presumptive FET.  As to both the in-or-out and length-of-stay decisions, the Board carries the burden of overcoming a presumption.  The Board has an obligation to precisely and transparently explain the reasons for overcoming both presumptions so as to permit meaningful appellate review of both decisions.  As we have noted, absent a sufficient statement of reasons, we cannot

ascertain whether either decision is justified or arbitrary and capricious.  Cf. Mejia, 446 N.J. Super. at 378–79.

In sum, it would be inappropriate to impose a lengthy FET to essentially coerce Berta to admit his guilt.  Any such use of the FET decision-making process needlessly amplifies the dilemma faced by inmates who maintain their innocence.  See Medwed, 93 Iowa L. Rev. at 491.  In the final analysis, we will not permit the Board to use Berta's ongoing refusal to admit guilt as an artifice to convert his life sentence into a sentence of life without parole.

Reversed and remanded for proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1889-20

_____

**GEIGER, J.A.D., concurring.**

While I agree with the analysis and result in the court's opinion, I write separately to further address the seventy-two-month future eligibility term (FET) imposed by the State Parole Board (Board). This lengthy FET follows the previous 120-month FET imposed by the Board. In each instance, the lengthy FETs were based on palpably thin grounds described in detail in the court's opinion.

As in Acoli v. N.J. State Parole Bd., 250 N.J. 431 (2022) and State v. Thomas, 470 N.J. Super. 167 (App. Div. 2022), Berta has been an infraction-free, model prisoner for almost twenty years. His single asterisk offense, which did not involve violence or the threat of violence, occurred in 1987. He has not incurred any other infraction since October 30, 2002. Stated briefly, Berta has achieved and maintained minimum custody status without incident. He has taken courses, earned a college degree, and has served as the facility's inmate electrician for years. The psychological evaluations conducted at the request of the Board conclude that Berta is unlikely to commit new offenses if released. Yet, the Board has cumulatively imposed FETs totaling sixteen years.

We apply a deferential standard of review to the denial of parole and imposition of an extended FET. We determine if the Board's decision was an

abuse of discretion.  The result is that we rarely overturn the Board's decision to deny parole and to impose an extended FET.

The sentencing court imposed a thirty-year period of parole ineligibility. Berta has long since completed that period.  Despite behaving as a model prisoner since 2002 and having no prior criminal convictions or adjudications of delinquency, much less prior violations of parole or probation, the Board's actions had cumulative real-time consequences that effectively extended his parole ineligibility period for sixteen years.

The role of the Board is not to modify sentences.  Similarly, the intended purpose of imposing a FET is not punishment.  See State Parole Bd. v. Byrne, 93 N.J. 192, 205 (1983) ("Inmates serving sentences under the Code . . . have presumptively satisfied all punitive aspects of their sentences at the time they become eligible for parole.") (quoting In re Parole Application of Trantino, 89 N.J. 347, 370 (1982)).  Yet, for seemingly marginal reasons, the Board's actions appear to cross those boundaries.  The Board rendered these decisions under a procedural framework where the inmate appears before the Board unrepresented by counsel and without the ability to cross-examine the Board's experts, present his own expert testimony, discover the contents of confidential psychological

evaluations, or participate in an adversarial proceeding. See Thomas, 470 N.J. Super. at 194-95.

The issue largely unaddressed by our case law is the degree of discretion afforded to the Board in imposing lengthy FETs under the current framework. Considering the limited rights afforded to inmates to present their case for parole to the Board and to challenge the evidence relied upon by the Board in setting an FET, coupled with our deferential standard of review based on the resulting limited record developed before the Board, one must question whether the inmate's right to due process is satisfied. This issue is particularly troublesome when the FET imposed far exceeds the ordinary twenty-seven-month FET limit for murder cases under N.J.A.C. 10A:71-3.21(a)(1) and is well beyond the additional nine months that may added to an FET under N.J.A.C. 10A:71-3.21(d).

Mindful that setting new policies is largely the function of the Legislature and our Supreme Court, I respectfully suggest that our Supreme Court examine the Board's largely unbridled discretion to impose extended FETs, whether inmates should be afforded greater procedural rights before extended FETs are imposed, and whether the imposition of extended FETs warrants closer scrutiny under a less deferential standard of review.

Absent such protections, the imposition of lengthy FETs may well violate the fundamental fairness doctrine. As we explained in Thomas:

> "The fundamental fairness doctrine is an integral part of the due process guarantee of Article I, Paragraph 1 of the New Jersey Constitution, which protects against arbitrary and unjust governmental action." State v. Njango, 247 N.J. 533, 537 (2021); accord Jamgochian v. N.J. State Parole Bd., 196 N.J. 222, 239 (2008). "The doctrine serves as 'an augmentation of existing constitutional protections or as an independent source of protection against state action.'" State v. Melvin, 248 N.J. 321, 348 (2021) (quoting Doe v. Poritz, 142 N.J. 1, 108 (1995)). It advances "fairness and fulfillment of reasonable expectations" relating to "constitutional and common law goals." Njango, 247 N.J. at 549 (quoting State v. Vega-Larregui, 246 N.J. 94, 132 (2021)).
>
> [470 N.J. Super. at 200.]

The absence of adequate procedural safeguards implicates the fundamental fairness doctrine when the Board imposes FETs longer than twenty-seven months for reasons other than institutional infractions in the preceding ten years of confinement, a lengthy prior criminal or juvenile history, prior violations of parole or probation, or a psychiatric diagnosis or psychological risk assessment indicative of a propensity to reoffend.

Moreover, Berta has now been incarcerated for more than thirty-eight years for his crime. Berta's "advanced age" — he is now seventy-three — "is

A-1889-20

another highly relevant factor . . . ." Acoli, 250 N.J. at 469. "Studies have shown that as individuals age, their propensity to commit crime decreases and, in particular, that elderly individuals released from prison tend to recidivate at extremely low rates." Ibid.; see also State v. Davis, 96 N.J. 611, 618 (1984) ("[A]ge as a demographic variable, has consistently been found to be strongly related to subsequent criminal activity."). "Significantly, inmates released at age sixty-five or older [have] only a 6.5 percent rate of incurring a new conviction and only a 4.1 percent rate of reincarceration[.]" Acoli, 250 N.J. at 470 (citing U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 23 (2017) (finding that "[o]lder offenders were substantially less likely than younger offenders to recidivate following release")). Here, as in Acoli, "[n]othing in the Parole Board's decision suggests that the Board considered in any meaningful way the studies on the age-crime curve in denying parole to [Berta]." Ibid.

In my view, an extended FET must be based on substantial credible evidence in the record that objectively demonstrates that its duration directly relates to the amount of time necessary to address the reasons identified for denying parole. In turn, appellate review of an extended FET warrants a higher

degree of scrutiny by a reviewing court than afforded under the deferential standard of review we are currently obligated to apply.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1889-20